UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RICHARD HANSON, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 3:18-cv-00524 |
| ) | Judge Aleta A. Trauger |
| JOHN MCBRIDE and JAM ) | |
| PRODUCTIONS d/b/a BLACKBIRD ) | |
| STUDIOS, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM & ORDER

Richard Hanson has filed a Motion for Summary Judgment (Docket No. 30), to which John McBride and Jam Productions d/b/a Blackbird Studios ("Blackbird") have filed a Response (Docket No. 40), and Hanson has filed a Reply (Docket No. 43). Mr. McBride and Blackbird have also filed a Motion for Summary Judgment (Docket No. 34), to which Hanson has filed a Response (Docket No. 37), and the defendants have file a Reply (Docket No. 42). For the reasons set out herein, both motions will be denied.

## I. BACKGROUND[1]

"The Fair Labor Standards Act of 1938 ['FLSA'] sets forth employment rules concerning minimum wages, maximum hours, and overtime pay." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011). "[S]ubstantive rights under . . . the FLSA are non-waivable." *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 831 (6th Cir. 2019). The reasoning for such a rule, the Supreme Court has recognized, is to prevent employers from using

---

[1] The facts laid out herein are, except where otherwise indicated, taken from the parties' respective Responses to Statements of Undisputed Facts. Some facts are admitted for the purpose of one motion but may not be undisputed with regard to the other motion. The court's analysis is not contingent on treating any fact conceded for the purposes of only one motion as necessary to the resolution of the other motion.

their superior leverage to force workers to accept lesser pay, "'nullify[ing] the purposes' of the statute and thwart[ing] the legislative policies it was designed to effectuate." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (quoting *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707 (1945)).

The principle that FLSA rights are non-waivable plays an important role in the overall scheme of the Act, but it is also in tension with the fact that voluntary, uncompensated work— for example, charitable work by volunteers or work by students pursuing an educational benefit— has long been a part of ordinary life. To account for these types of work, Congress and the courts have recognized exceptions to the Act's definition of "employee" that carve out space for permissible uncompensated work in certain traditional settings. *See*, *e.g.*, *Brown v. N.Y. City Dep't of Educ.*, 755 F.3d 154, 164 (2d Cir. 2014) (volunteers); *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 531 (6th Cir. 2011) (vocational students).

Courts, however, have also recognized that employers may sometimes attempt to evade the FLSA by artificially turning what would normally be compensated work *into* uncompensated work in ways that exceed the intended scope of the relevant recognized exception. *See, e.g.*, *Walling v. Portland Terminal Co.*, 330 U.S. 148, 153 (1947) (addressing possibility of an employer's using uncompensated trainees as "a way for evasion of" the FLSA). Despite decades of caselaw addressing the issue, it continues to be a challenge to determine where the FLSA ends and a permissible non-employment relationship begins. *See, e.g.*, *Solis*, 642 F.3d at 522 ("The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.") (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)).

One of the settings in which these issues often arise today is in the context of unpaid internships. *See, e.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 534 (2d Cir. 2016). To assist employers, the U.S Department of Labor has promulgated guidelines setting forth factors relevant to whether a particular unpaid internship is permissible under the FLSA. Several of the factors focus on whether the intern is receiving an educational benefit from the work performed, particularly a benefit that would complement the intern's ongoing schooling. *See* U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet # 71, Internship Programs Under The Fair Labor Standards Act (January 2018).[2] For example, the Department recommends considering "[t]he extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit" and "[t]he extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning." The Department also suggests considering whether the interns are performing work that displaces paid employees. *Id.*

Blackbird is a music production company owned by John McBride and his wife Martina McBride.[3] (Docket No. 39 ¶ 1; Docket No. 41 ¶ 8.) On June 12, 2012, Blackbird hired Hanson as its Operations Manager. (Docket No. 41 ¶ 1.) Hanson was supervised by Mr. McBride and Studio Manager/General Manager Rolff Zwiep. (*Id.* ¶ 7.) In early 2013, Hanson took over the responsibility of overseeing Blackbird's unpaid internship program. (Docket No. 39 ¶ 3; Docket No. 41 ¶ 14.) In 2014, Hanson's responsibilities expanded to include supervising paid assistant engineers. (Docket No. 39 ¶ 6.)

---

[2] Available at http://www.dol.gov/whd/regs/compliance/whdfs71.pdf. The Department's criteria related to unpaid interns are cited by Hanson in his briefing. (Docket No. 31 at 3.) Hanson refers to six factors, although there are now seven.

[3] The defendants deny that Ms. McBride plays any role in the day-to-day operations of Blackbird. (Docket No. 41 ¶ 8.)

After taking over the unpaid internship program, Hanson became concerned that interns were being used for personal errands and custodial work that offered no educational benefit to them and, therefore, undermined the argument that they were not FLSA employees. (*Id.* ¶ 17.) For example, Hanson has produced an email he received on April 12, 2014, from Connor Thuotte, an unpaid intern. (Docket No. 33-2 at 1.) Thuotte describes being required to search Mr. McBride's house, armed with a loaded firearm, searching for a suspected intruder. Thuotte wrote that he was "shaken up" about how the situation "could have played out." "I just hope it's understood," Thuotte wrote, "that this is not what we are here to do and a line needs to be drawn somewhere." (*Id.*)

In an email from another intern during Hanson's time at Blackbird, the intern complained to Hanson, "I feel as if I am working for free and not getting anything in return." (*Id.* at 4.) He described a "lack of learning opportunities" and time spent on tasks such as "installing and organizing electrical and computer wires." (*Id.*) An eventual U.S. Department of Labor investigation obtained statements from other former Blackbird interns, confirming similar potential issues with the program. (*See, e.g.*, *id.* at 8 ("I was not taught anything of note while interning there.").)

Hanson first raised his concerns regarding the internship program to Mr. McBride in 2013. (Docket No. 39 ¶ 16.) He did not raise the issue again until May 31, 2015, when he sent an email to Mr. McBride proposing a number of changes in Blackbird policies and practices. Among the suggestions was that the company start using paid "runners" rather than unpaid interns. (*Id.* ¶¶ 11, 16.) Below that written suggestion, he included three bullet points addressing either why the change was justified or how it could be paid for. One bullet point was, "If they're getting paid, then we wouldn't have to worry about being in violation of the labor laws." (Docket

No. 35-1 ex. 3 at 42.) Hanson's email did not lead to a discontinuation of the unpaid internship program.

Hanson raised the possibility of replacing the unpaid interns with paid runners again in March or April of 2017, in communications with Mr. McBride and Zwiep. (Docket No. 39 ¶ 14.) In his deposition testimony, Mr. McBride suggested that, in late 2016 or early 2017, he heard from Zwiep that Hanson had threatened to contact the Department of Labor about the internship program. (Docket No. 38-2 at 61.)

At 3:00 p.m. on June 6, 2017, following a series of misunderstandings regarding an intern's retrieval of a lunch order for Ms. McBride, Hanson sent an anonymous email to the Department of Labor about his unnamed employer's practices related to interns, as well as assistant engineers who were not receiving overtime pay. (Docket No. 39 ¶ 23; Docket No. 41 ¶¶ 28–30.) After he sent the email, Hanson went to Zwiep's office and told Zwiep what he had done. "You did what?" Zwiep replied, in what he has characterized as disbelief. (Docket No. 41 ¶ 30.) Hanson testified in his disposition that Zwiep said, "You shouldn't have done that. That could shut the whole company down and everybody would be out of a job. Are you okay with that?" The defendants deny that those were Zwiep's words but concede that Zwiep testified that he asked Hanson if he understood the consequences of his actions for Blackbird and its employees. (Docket No. 33-10 at 86; Docket No. 41 ¶ 31.)

Hanson left Zwiep's office, and, a few minutes later, Zwiep called Mr. McBride. (Docket No. 41 ¶ 34.) Zwiep testified that he said to McBride, "Hey, [Hanson] just left my office. . . . [H]e was doing his usual rant,[4] and then he brought up the fact that he anonymously contacted the . . . Department of Labor . . . and reported his concerns about our employment, you know,

---

[4] It is not entirely clear what Zwiep meant by "usual rant," but he appears to have been referring to Hanson's history of complaints about how Blackbird was run, which included matters unrelated to FLSA issues.

how we were conducting the assistant engineers." (Docket No. 33-8 at 106.) Mr. McBride asked Zwiep to repeat himself, and Zwiep reiterated that Hanson had filed a report regarding potential FLSA violations. Mr. McBride responded with a series of expletives. (Docket No. 41 ¶¶ 36–37.) Shortly thereafter, Mr. McBride ended the call and said he would call Zwiep back. (*Id.* ¶ 39.)

Mr. McBride called Hanson shortly after getting off the phone with Zwiep. He said to Hanson, "I hear you've got a fucking problem and you're gonna call the Better Business Bureau on me, or some fucking shit." Hanson responded, "No. I emailed the Department of Labor about the interns." Mr. McBride interrupted him and said, "Well, I'm fucking done with you. Get your shit and get the fuck out of my studio." (Docket No. 33-10 at 90; Docket No. 41 ¶¶ 42–43.) Hanson gathered his effects and left the Blackbird studio. (Docket No. 41 ¶ 44.) In a phone conversation with Zwiep shortly thereafter, Mr. McBride stated, "I fired his ass." (*Id.* ¶ 45.) McBride added, "I can't believe he contacted them." (*Id.* ¶ 47.)

Zwiep eventually drafted a letter on Blackbird stationary memorializing Hanson's termination. (*Id.* ¶ 48.) The letter gives no reason for the termination and reads, in its entirety:

> June 16, 2017
>
> To Whom It May Concern,
>
> As of, end of business day, June 6, 2017, Rich Hanson is no longer employed by Jam Productions, Inc. D.B.A. – Blackbird Studio.
>
> Respectfully,
>
> Rolff Zwiep
> - studio manager

(Docket No. 33-5.)

The defendants concede that, prior to Hanson's FLSA report, Mr. McBride did not intend to fire Hanson on June 6, 2017. (Docket No. 41 ¶ 51.) They assert, however, that the decision to

6

fire Hanson had actually been made prior to that date, and Mr. McBride was merely waiting for Hanson's intended replacement, Blackbird recording engineer Kevin Boettger, to return from his honeymoon. (*Id.*) According to the defendants' Responses to Interrogatories,

> Plaintiff repeatedly criticized the way Defendant McBride ran his business to other employees of Blackbird Studios . . . . He speculated about the pay of employees . . . and complained that he believed they were overpaid. He also complained that Defendant McBride, [and Zwiep] . . . did not know what they were doing. Plaintiff also complained about how Defendant McBride spent money associated with the business. Plaintiffs complaints were disruptive to the work environment and other employees complained about them to Defendant McBride. . . . Defendant McBride had considered terminating Plaintiff's employment for months prior to doing so, but made the final decision to terminate Plaintiff's employment in May 2017. Defendant McBride decided to replace Plaintiff as Operations Manager with Kevin Boettger, who agreed to accept the position. However, Mr. Boettger was getting ready to get married and leave for his honeymoon, so Defendant McBride preferred to wait until Mr. Boettger returned to terminate Plaintiff's employment.[5]

(Docket No. 35-2 at 3.) Boettger had gotten married in May 2017, and, in early June 2017, he left the country for his honeymoon, as he had informed Mr. McBride he intended to do. He was expected to return around June 15, 2017. (Docket No. 41 ¶¶ 53–54.)

Boettger testified in his deposition that, several months before his wedding in May, Mr. McBride had asked him if he would be interested in taking the Operations Manager position if it became available. According to Boettger, he said that he would be interested, and Mr. McBride asked him about when he might be able to take the new job. However, Boettger did not characterize that earlier conversation as an offer and acceptance. He also testified that Mr. McBride did not, at the time, make any representation that the company intended to terminate

---

[5] The court notes that the defendants have relied, to an unusual degree, on their interrogatory responses rather than their deposition testimony in their citations to the record. Hanson argues—with persuasive examples—that the defendants have done so because discovery did not confirm (and in some cases refuted) the details of the account originally offered by the defendants. At least some of the defendants' key assertions, however, are reflected in the discovery testimony. The court excerpts the interrogatory response here because the defendants have repeatedly cited to it and because it presents the most concise and comprehensive statement of the defendants' theory of the case.

7

Hanson. Rather, while Boettger was on his honeymoon, Mr. McBride called him to inform him that Hanson had been fired and to offer him the position. According to Boettger, that is when he accepted the job. (Docket No. 33-9 at 9–10, 13–14, 28.)

In Zwiep's deposition testimony, he characterized the process of deciding to fire Hanson as follows:

> So [Boettger] said that—this was possibly, I don't remember the exact time, but it had to be like March or April, like March, probably, possibly even before that, and he said, I'll do the job. And then [Hanson] just never got fired. And then it was conversation about it all the time, and then finally [Mr. McBride] saw a timeline, he just thinks this way and you just have to know him, how he plans stuff, it had been talked about for a long time, and then when [Boettger] said, I'm going on my honeymoon in June, or the end of May/June, I don't know how many days, if it was 10, or 12, or 15 days, or whatever. . . . But this is way ahead. And in order to make that work in the timeline [Mr. McBride] said, All right, so here's the plan, and this is one of those phone calls and he called me, he said, I'm gonna fire [Hanson] and I'm gonna put [Boettger] in his place when [Boettger] gets back from his honeymoon.

(Docket No. 40-1 at 133.)

In his deposition, Mr. McBride testified that his "biggest problem" with Hanson was Hanson's "consistently negative" attitude and "complaining about everything around him." He testified that, by June 6, 2017, he knew he was "firing [Hanson] anyway," but the "straw that broke the camel's back was the lunchtime fiasco"—that is, the misunderstandings about Ms. McBride's lunch delivery, not the subsequent email to the Department of Labor. (Docket No. 33-7 at 72, 86.) Zwiep, however, testified that the "straw that broke the camel's back" was Hanson's "[t]elling us that he had contacted the Department of Labor." (Docket No. 33-8 at 118.) Zwiep added, however, that "it just happened to be that thing" and "it could have been any other negative thing." (*Id.* at 123.) Zwiep testified that, throughout Hanson's time at Blackbird, Hanson had had a negative attitude and had frequently complained about issues at the company

8

in a "ridiculously exaggerated and extremely negative" way that would "just wear people out" so that they "hated to see him coming." (Docket No. 40-1 at 162.)

The Wages and Hours Division of the Department of Labor found Hanson's allegations of FLSA violations to be "partially substantiated" and required Blackbird to pay over $40,000 in improperly withheld overtime pay and liquidated damages related to its paid employees.[6] Blackbird was not found to be in violation of the FLSA with regard to its unpaid internship program. Mr. McBride agreed, on behalf of the company, to comply with the FLSA in the future. (Docket No. 33-1; Docket No. 35-5 at 4; Docket No. 41 ¶¶ 12–13.)

On June 5, 2018, Hanson sued Blackbird and the McBrides for retaliation under the FLSA and the Tennessee Public Protection Act ("TPPA") (Docket No. 1.) On July 18, 2018, the court dismissed the claim against Ms. McBride. (Docket No. 18.) The parties proceeded to discovery and have now filed cross-motions for summary judgment.

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must

---

[6] The details of how Hanson's email ultimately led to a formal investigation have not been addressed by the parties and are not relevant to the pending motions.

demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

#### A. FLSA Retaliation

The FLSA makes retaliation for reporting a violation of the Act illegal: "[I]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3). The Sixth Circuit has held that, to state a *prima facie* claim for FLSA retaliation based on circumstantial evidence, a plaintiff must show that

> (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (citation omitted). Once the plaintiff has established the *prima facie* case, the defendant has the burden of producing some

legitimate, nondiscriminatory reason for the action. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Once the defendant has met its burden, it is the plaintiff's burden to show that this proffered reason was pretextual. *Id.* at 1082.

As a threshold matter, Hanson argues that the familiar *McDonnell Douglas* burden-shifting framework does not apply to his case, because he has produced direct evidence of discrimination in the form of Mr. McBride's own contemporaneous statements. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action.").

In the Sixth Circuit, the bar for direct evidence that would allow a plaintiff to bypass *McDonnell Douglas* is high, typically requiring something akin to "the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). Mr. McBride's statements and actions surrounding Hanson's termination may come close to meeting that standard, but they do leave some room for ambiguity. Specifically, it is possible to read the exchange between Hanson and Mr. McBride as Mr. McBride's becoming enraged (or becoming further enraged) by Hanson's email but being driven, by that rage, only to announce a termination that had already been decided upon for other reasons. *McDonnell Douglas* therefore provides the appropriate framework, at least with regard to Hanson's motion, which requires the court to draw all inferences in the defendants' favor.

In any event, the court does not find the question of whether or not to rely on *McDonnell*

*Douglas* to be of particular importance in this instance. Virtually all of the key disagreements between the parties in this case—whether framed as being about causal connection, pretext, or the sufficiency of the direct evidence—involve the same issue: the veracity of the defendants' account of when the decision was made to fire Hanson and why he was fired. Without that alternative account, all of the evidence points to a textbook case of retaliation, in which an employee reported an unlawful practice and was immediately fired by an employer as a direct response. All that matters, then, is whether the defendants' version of events negates some essential component of that picture.

The defendants argue that Hanson cannot establish his *prima facie* case (or cannot show discrimination through direct evidence, or cannot show pretext) because the decision to terminate Hanson was made prior to his email to the Department of Labor and/or prior to Mr. McBride's knowledge of the email.[7] There is, however, ample evidence calling the defendants' timeline into doubt. Both the timing of Hanson's termination and Mr. McBride's own contemporaneous statements are, to say the least, strongly suggestive that he fired Hanson for reporting the company to the Department of Labor. In order to conclude otherwise, one must rely on uncorroborated testimony, made in the context of litigation, about Mr. McBride's internal thought processes and the discussions between Zwiep and Mr. McBride.

The defendants are correct that Hanson's allegedly negative attitude could be a legitimate, nondiscriminatory reason for terminating an employee. However, the strong contemporaneous evidence of Mr. McBride's motivations is sufficient to allow a reasonable factfinder to find that reason to be pretextual. "Pretext is a commonsense inquiry: did the

---

[7] As part of his response, Hanson argues that the Department of Labor email was not his only protected activity, because he also internally complained about the internship program. The defendants argue that any such complaints were merely part of Hanson's ordinary job duties and not protected under the FLSA. Determining whether Hanson's internal complaints involved protected activity, however, is not necessary to the court's ruling on these motions.

employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). To that end, a plaintiff can establish pretext by showing that "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the employer's] action, or (3) the proffered reason was insufficient to motivate the action." *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 535 (6th Cir. 2011) (quoting *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 491 (6th Cir. 2006)). For reasons that the court has already discussed, a reasonable person could conclude that a bad attitude was not the actual reason for Mr. McBride's decision. Mr. McBride may have been irritated by Hanson in the past and may even had thought about firing him, but he actually did fire him in the specific context of Hanson's telling the Department of Labor about the company's alleged FLSA violations. The defendants' motion will be denied.

Nevertheless, Hanson's showing is not so ironclad that the court can grant summary judgment in his favor. A reasonable factfinder could credit the testimony by Mr. McBride and Zwiep that the decision to terminate Hanson was made earlier and based on his general negative attitude. Moreover, while Boettger's deposition testimony does not actually establish that a decision to terminate Hanson had been made ahead of time, it is at least supportive of the inference that Mr. McBride had considered terminating Hanson earlier and may have formed a plan to do so. The court cannot conclude that Hanson's evidence has foreclosed the possibility that a reasonable person would accept the defendants' version of events.

Finally, Hanson argues that, even if a reasonable factfinder accepted the defendants' version of events, he would be entitled to a verdict in his favor with regard to the decision to fire him a bit over a week earlier than intended, which would itself be an adverse action under the FLSA. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010)

13

(recognizing retaliation claim based on fact that the defendants fired the plaintiff "earlier than it otherwise would have"). The defendants argue that a request for summary judgment on such a small slice of Hanson's claims is the equivalent of a motion for partial summary judgment, and the court has ordered that no such motion could be made without leave of the court. (Docket No. 29 at 1.) Even if the court entertains Hanson's argument, however, it is not, in fact, the case that the undisputed facts show that Hanson was terminated early based on his FLSA reporting. As Hanson himself has argued, there is evidence suggesting that he was not terminated early at all because there was no preexisting finalized plan to terminate him. In addition, Mr. McBride has testified that his decision was motivated by the lunch mix-up that preceded Hanson's report. Although Hanson has identified some persuasive credibility issues regarding that statement, Mr. McBride's testimony is not so clearly incredible that the court can disregard it for the purposes of Rule 56. The court, therefore, will deny both motions for summary judgment with regard to Hanson's FLSA claim.

### B. Tennessee Public Protection Act

The TPPA provides that no employee "shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b); *see Sykes v. Chattanooga Hous. Auth.*, 343 S.W. 3d 18, 27 (Tenn. 2011). The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). "[T]he TPPA requires the plaintiff to prove that retaliation for the protected conduct was the sole reason" for his termination. *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (citing *Haynes v. Formac Stables, Inc.*, 463

S.W.3d 34, 37 (Tenn. 2015); *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002)) (emphasis omitted).

The parties' arguments on this claim are largely the same as their arguments on the FLSA retaliation claim, recast in light of the specific requirements of the TPPA. Hanson argues that he was terminated for refusing to remain silent about Blackbird's FLSA violations; Blackbird, the only defendant against whom a TPPA claim has been stated, argues that Hanson was terminated in whole or at least in part for his negative attitude. Choosing between the parties' competing versions of events would require the court to make credibility determinations that would be inappropriate under Rule 56. The motions will be denied with regard to the TPPA.

## IV. CONCLUSION

For the foregoing reasons, Hanson's Motion for Summary Judgment (Docket No. 30) and the defendants' Motion for Summary Judgment (Docket No. 34) are both **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge